**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **ANDREW AVERETT, M.D.; ROBERT** | ) | |
| **BARKER, M.D.; RICKEY CARSON, M.D.;** | ) | |
| **CLAREY DOWLING, M.D.; ARNOLD** | ) | |
| **HOPLAND, M.D.; RENEE JONES, M.D.;** | ) | |
| **HAILU KABTIMER, M.D.; ABHAY** | ) | |
| **KEMKAR, M.D.; JONATHAN KERLEY,** | ) | |
| **M.O.; JACK KING, JR. , M.D.; CHARLES** | ) | |
| **LEONARD, M.D.; SCOTT MAY, M.D.;** | ) | |
| **JOSEPH RUPARD, M.D.; DANIEL** | ) | |
| **SCOTT, III, M.D.; HAK SEO, M.D.; NAZIA** | ) | |
| **SHEHZAD, M.D.; WILLIAM TERRELL,** | ) | |
| **M.D.; CLINTON WEBB, M.D.; JERALD** | ) | |
| **WHITE, M.D.; THERESA WOODARD,** | ) | |
| **M.D.; and MONICA WRIGHT, M.D.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HEALTH AND HUMAN SERVICES;** | ) | |
| **BRIAN DEESE, Secretary of the United** | ) | |
| **States Department of Health and Human** | ) | |
| **Services; CENTERS FOR MEDICARE AND** | ) | |
| **MEDICAID SERVICES; and ANDY** | ) | |
| **SLAVITT, Administrator of the Centers for** | ) | |
| **Medicare and Medicaid Services,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Andrew Averett, Robert Barker, Rickey Carson, Clarey Dowling, Arnold
Hopland, Renee Jones, Hailu Kabtimer, Abhay Kemkar, Jonathan Kerley, Jack King, Jr., Charles
Leonard, Scott May, Joseph Rupard, Daniel Scott, III, Hak Seo, Nazia Shehzad, William Terrell,
Clinton Webb, Jerald White, Theresa Woodard, and Monica Wright (collectively "Physicians")
state as follows:

# INTRODUCTION

1.     The Physicians are primary care providers practicing medicine in Tennessee. They predominantly serve rural communities and disadvantaged populations, including Medicaid participants. The majority of the Physicians practice in counties designated as Health Professional Shortage Areas ("HPSA") for primary care by the Health Resources Services Administration. Thus, they provide vital services to vulnerable populations with limited access to medical care.

2.     The United States Congress enacted a statute, codified at 42 U.S.C. § 1396a(a)(13)(C) ("Medicaid Enhanced Payment Statute"), specifically designed to increase Medicaid payments to physicians who provided certain services in 2013 and 2014. The Medicaid Enhanced Payment Statute clearly and unambiguously provides that these increased Medicaid payments were to be made to any "physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine." *Id.*

3.     The Physicians satisfy the criteria described in the Medicaid Enhanced Payment Statute and are precisely the individuals Congress intended to benefit when enacting the Medicaid Enhanced Payment Statute.

4.     Centers for Medicare and Medicaid Services ("CMS"), however, added a requirement through the regulatory rulemaking process that arbitrarily cuts off these increased Medicaid payments for any non-board-certified physician if fewer than sixty percent of "the Medicaid codes he or she has billed" fall within certain specified billing code categories. 42 C.F.R. § 447.400.

5.   CMS did not adopt this sixty-percent-threshold requirement from § 1396a(a)(13)(C).   Rather, CMS took that requirement from a completely different and inapplicable statute regarding Medicare payments – 42 U.S.C. § 1395l(x).

6.   CMS's rule is contrary to Congress's intent and the statutory scheme.

7.   While Congress imposed a sixty-percent-threshold requirement for Medicare payments made under § 1395l(x), it decided to omit such a requirement for Medicaid payments made under § 1396a(a)(13)(C).

8.   During the notice and comment period, numerous commenters (including several state agencies) pointed out that CMS's proposed rule was contrary to the Medicaid Enhanced Payment Statute.   Commenters also raised serious concerns that CMS's use of billed codes, as opposed to "allowed charges" as used in the Medicare statute from which the threshold requirement was lifted, would cause absurd consequences by arbitrarily and capriciously discriminating against certain physicians – particularly those in rural and other underserved areas.   CMS did not consider, respond to, or factor in these legitimate concerns when promulgating the final rule, codified at 42 C.F.R. § 447.400 ("Final Rule").

9.   The Final Rule arbitrarily excludes non-board-certified physicians from receiving increased Medicaid payments under the Medicaid Enhanced Payment Statute if they do not have a Medicaid billing code history consisting of at least sixty percent of certain designated codes.   This Final Rule is contrary to statutory law, and is arbitrary and capricious.   Indeed, the Final Rule excludes those physicians whom Congress intended to benefit when enacting the statute.

10.   The Physicians, none of whom are board-certified, received payments under § 1396a(a)(13)(C) for Medicaid services provided in 2013 and 2014.   Many of the Physicians

invested the enhanced reimbursement into their practices by purchasing equipment, expanding clinic hours or hiring additional staff to enable them to offer more primary care services to underprivileged patients.

11. In mid-2015, the Bureau of TennCare ("TennCare") determined that it must recoup payments made to the Physicians, based on the sixty-percent-threshold requirement in the Final Rule. In some if not all instances, TennCare determined that the Physicians did not satisfy the sixty-percent threshold requirement because certain nonprofessional ancillary services, such as lab tests performed in conjunction with an office visit, were billed under the Physicians' individual Medicare numbers. Even though sixty percent of the professional physician services performed by these Physicians fell within the requisite primary care codes, sixty percent of the total "Medicaid codes" billed by these Physicians did not fall within the requisite primary care codes due to the inclusion of the ancillary codes in the denominator of the sixty-percent-threshold determination.

12. The Physicians have contested the recoupment in a consolidated TennCare Provider Appeal currently pending before the Commissioner of the Tennessee Department of Finance and Administration. Because the hands of TennCare and the Tennessee Department of Finance and Administration are effectively tied by the Final Rule and they lack authority to invalidate CMS regulations, the Physicians are pursuing the present federal litigation to invalidate the unlawful Final Rule. The Physicians intend to request a stay of the TennCare Provider Appeal, and any potential recoupment efforts by TennCare based upon the sixty-percent-threshold requirement in the Final Rule, until full resolution of this litigation.

13. This Court should hold unlawful and set aside, 5 U.S.C. § 706(2), the Final Rule's sixty-percent-threshold requirement because it is contrary to 42 U.S.C. § 1396a(a)(13)(C).

Further, that requirement and the methodology used to calculate the threshold should be set aside as arbitrary and capricious, especially given that CMS did not consider and respond meaningfully to serious and legitimate concerns raised by multiple parties during the notice and comment period.

## THE PARTIES

14.     The Physicians are primary care providers practicing throughout Tennessee, and each has "a primary specialty designation of family medicine, general internal medicine, or pediatric medicine," within the meaning of the Medicaid Enhanced Payment Statute.  42 U.S.C. § 1396a(a)(13)(C).  Several of the Physicians have been practicing medicine for thirty years or more and began practicing long before specialty board certification became prevalent in the medical field.  For example, the American Board of Family Medicine issued its first board certification in 1970, around the time when several of the Physicians began practicing medicine. Board certification was not required for licensure nor a criteria for hospital privileges at that time.

15.     Dr. Andrew Averett is a primary care practitioner specializing in general medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute.  He practices in Hohenwald, Tennessee, which is a HPSA for primary care.  He has been practicing medicine since 1989.  Michael Parker is a Physician Assistant supervised by Dr. Averett and TennCare seeks recoupment of reimbursement for services provided by Dr. Averett and Mr. Parker.

16.     Dr. Robert Barker is a primary care practitioner specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute.  He practices in Jackson, Tennessee, portions of which are a HPSA for primary care.  He has been

5

practicing medicine since 1962. Japeth Durham is a Nurse Practitioner supervised by Dr. Barker and TennCare seeks recoupment of reimbursement for services provided by Dr. Barker and Mr. Durham.

17.     Dr. Ricky Carson is a primary care practitioner specializing in family medicine and pediatrics, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Memphis, Tennessee, which is a HPSA for primary care. He has been practicing medicine since 1974. The enhanced Medicaid payments in 2013 and 2014 enabled his practice to open an outreach clinic for bilingual uninsured patients, expand hours to weekends and upgrade other services at his clinic, which serves a patient population comprised of more than 90 percent Medicaid beneficiaries or uninsured patients.

18.     Dr. Clarey Dowling is a primary care practitioner specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Brownsville, Tennessee, which is a HPSA for primary care and is located in Haywood County, one of the poorest counties in the state. He has been practicing medicine since 1979. His patient population consists of 60 percent Medicaid recipients. He also provides medical care for nursing home patients, the indigent, hospital and emergency room patients and spends a significant amount of time volunteering in the community. The increased reimbursement he received pursuant to the Medicaid Enhanced Payment Statute enabled him to hire a bilingual nurse to assist with communications to Spanish-speaking patients, giving them an alternative to seeking treatment at a hospital. In addition, Dr. Dowling hired an internal medicine specialist who provided expertise in preventative medicine and diabetes treatment and prevention and established clinics and informational sessions for the Medicaid population.

Unfortunately, he was compelled to terminate her employment due to proposed recoupment of reimbursement paid under the Medicaid Enhancement Payment Statute.

19.     Dr. Arnold Hopland is a primary care practitioner specializing in general medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute.  He practices in Elizabethton, Tennessee.  He has been practicing medicine since 1979.

20.     Dr. Renee Jones is a primary care practitioner specializing in pediatrics, therefore she meets the eligibility criteria established in the Medicaid Enhancement Statute.  During 2013 and 2014, she practiced in Memphis, Tennessee, which is in a HPSA for primary care.  She has been practicing medicine since 1997.

21.     Dr. Hailu Kabtimer is a primary care practitioner specializing in internal medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute.  He practices in Hendersonville, Tennessee.  He has been practicing medicine since 1986.

22.     Dr. Abhay Kemkar is a primary care practitioner specializing in internal medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute.  He practices in Sparta, Tennessee, which is a HPSA for primary care.  He has been practicing medicine since 1992.

23.     Dr. Jonathan Kerley is a primary care practitioner specializing in internal medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute.  He practices in Chattanooga, Tennessee.  He has been practicing osteopathic medicine since 1999. More than half of his patients are Medicaid recipients and he used the increased reimbursement received under the Medicaid Enhanced Payment Statute to open additional locations and hire new staff to better serve this patient population.  Dr. Kerley also serves as the

medical director for various police department, EMS and sheriff department teams in Collegedale and Sequatchie, Tennessee. His passion for medical missions led him to co-found International Christian Medical Outreach, through which he has coordinated and provided free medical care in multiple countries throughout Central and South America.

24. Dr. Jack King, Jr. is a primary care provider specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Knoxville, Tennessee, portions of which are a HPSA for primary care. He has been practicing medicine since 1971. He was board certified by the American Academy of Family Physicians beginning in 1978 and was continuously recertified through 2009. At that time, Dr. King anticipated retirement from practice and chose not to renew certification. He remained current with continuing medical education requirements and treated Medicaid beneficiaries as a significant portion of his patient population until his retirement from private practice in 2014. Dr. King's decades of experience in primary care were critical to successful outcomes for his Medicaid patients and quality of care did not diminish after 2009 when his board certification ceased.

25. Dr. Charles Leonard is a primary care provider specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Talbott, Tennessee. He has been practicing medicine since 1978. Dr. Leonard serves as the chairman of the insurance committee of the Tennessee Medical Association ("TMA") and travels to Nashville to support bills before the legislature that the TMA membership believes can benefit patients and doctors. Although once board certified in family medicine, he decided against re-certification due to the high cost. In keeping with the intent of

the Medicaid Enhanced Payment Statute, he increased the number of TennCare patients he saw during 2013 and 2014.

26.     Dr. Scott May is a primary care practitioner specializing in general medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Elizabethton, Tennessee. He has been practicing medicine since 1983.

27.     Dr. Joseph Rupard is a primary care practitioner specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Shelbyville, Tennessee, which is a HPSA for primary care. He has been practicing medicine since 1990. Dr. Rupard used the enhanced Medicaid payments to open a clinic in Lewisburg, Tennessee, a HPSA for primary care, to treat an additional 11,000 patients annually.

28.     Dr. Daniel Scott, III is a primary care practitioner specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Millington, Tennessee, portions of which are a HPSA for primary care. He has been practicing medicine since 1985.

29.     Dr. Hak Seo is a primary care practitioner specializing in internal medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Dayton, Tennessee, which is a HPSA for primary care. He has been practicing medicine since 2008.

30.     Dr. Nazia Shezhad is a primary care practitioner specializing in family medicine, therefore she meets the eligibility criteria established in the Medicaid Enhancement Statute. She practices in Johnson City, Tennessee. She has been practicing medicine since 2001.

31.     Dr. William Terrell is a primary care practitioner specializing in pediatrics, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He

practices in of Memphis, Tennessee, which is a HPSA for primary care. He has been practicing medicine since 1972. A portion of the monies his office received pursuant to the Medicaid Enhanced Payment Statute enabled purchase of updated medical equipment, including two pediatric vision testing systems to identify optical or neural abnormalities related to vision that a pediatrician might not otherwise detect.

32.     Dr. Clinton Webb is a primary care practitioner specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in Johnson City, Tennessee. He has been practicing medicine since 1970.

33.     Dr. Jerald White is a primary care practitioner specializing in family medicine, therefore he meets the eligibility criteria established in the Medicaid Enhancement Statute. He practices in the towns of Brownsville, Alamo and Jackson, Tennessee, all of which are HPSAs for primary care and are in counties with some of the state's highest percentages of indigent citizens and Medicaid recipients. Accordingly, Dr. White's patient population is comprised of at least 60 percent Medicaid recipients. He has been practicing medicine since 1972. Dr. White invested the money from the enhanced Medicaid payments to hire additional staff and purchase equipment to continue to provide comprehensive care with emphasis on education and prevention. In July 2014, the local hospital in Brownsville was closed, which further limited the community's access to healthcare services, especially emergency care, and increased demand on primary care practitioners for ancillary services needed to adequately treat patients in compliance with the appropriate standard of care.

34.     Dr. Theresa Woodard is a primary care practitioner specializing in internal medicine, therefore she meets the eligibility criteria established in the Medicaid Enhancement Statute. In 2013-2014, she practiced in Brownsville, Tennessee, which is a HPSA for primary

care.  She has been practicing medicine since 2002.  She was recruited to work in Brownsville due to her specialty skills and expertise in preventative medicine and diabetes.  To that end, she established diabetes clinics and other preventative medicine initiatives in the community.  Unfortunately, Dr. Woodard's employment was terminated due to the proposed recoupment of funds paid pursuant to the Medicaid Enhanced Payment Statute.  The loss of her skills and service is a great detriment to the community.

35.     Dr. Monica Wright is a primary care practitioner specializing in pediatrics, therefore she meets the eligibility criteria established in the Medicaid Enhancement Statute.  She practices in Cordova, Tennessee.  She has been practicing medicine since 1996.

36.     Defendant Brian Deese is the Secretary of the United States Department of Health and Human Services ("HHS").  Defendant Andy Slavitt is the Administrator of CMS.  These individual Defendants are the federal officers responsible for administering HHS and CMS and oversee the Departments that issued the Final Rule.  They are sued in their official capacities.

37.     Defendant HHS, which has its principal office at 200 Independence Avenue, S.W., Washington, D.C. 20201, is a federal agency responsible for promulgation of the Final Rule.

38.     Defendant CMS, which has its principal office at 7500 Security Boulevard, Baltimore, Maryland 21244-1850, is a federal agency responsible for promulgation of the Final Rule.  CMS is a federal agency within HHS.

## JURISDICTION & VENUE

39.     The Physicians bring this action under the Administrative Procedures Act ("APA"), 5 U.S.C. § 551, *et seq.*

40.     This Court has jurisdiction under 28 U.S.C. § 1331 because all causes of action arise under the laws of the United States.

41.     The Physicians have standing to bring this action because they have been and will be directly impacted and harmed by the unlawful provisions of the Final Rule.

42.     The Final Rule is a final agency action that is ripe for review.

43.     This Court has the authority to grant the requested relief under, *inter alia*, the APA and the Declaratory Judgment Act.

44.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claims occurred in the Middle District of Tennessee.

45.     This Complaint is timely under 28 U.S.C. § 2401(a)

## STATUTORY AND REGULATORY BACKGROUND

46.     CMS's Final Rule is invalid both because it is contrary to the laws of Congress and because it is arbitrary and capricious.

47.     For the reasons explained below, this Court should uphold the intent of Congress when enacting the Medicaid Enhanced Payment Statute by declaring the Final Rule unlawful.

## I.     Congress Enacted a Statute Requiring Increased Medicaid Payments to Physicians with Certain Primary Specialty Designations.

48.     On March 30, 2010, President Barack Obama signed the Health Care and Education Reconciliation Act of 2010 (the "Act") into law.

49.      The Act was passed by means of the reconciliation process in order to amend the Patient Protection and Affordable Care Act (the "ACA"), which had been signed into law the week before.

50.     Section 1202 of the Act provided that physicians serving the Medicaid population would receive increased Medicaid payments for certain primary care services for the years 2013 and 2014.

51.     As codified in 42 U.S.C. § 1396a, the Medicaid Enhanced Payment Statute provides:

> [P]ayment for primary care services (as defined in subsection (jj)) furnished in 2013 and 2014 by a physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine at a rate not less than 100 percent of the payment rate that applies to such services and physician under part B of subchapter XVIII of this chapter (or, if greater, the payment rate that would be applicable under such part if the conversion factor under section 1395w-4(d) of this title for the year involved were the conversion factor under such section for 2009)[.]

42 U.S.C. § 1396a(a)(13)(C).  Thus, enhanced payments were required under the statute for "primary care services" performed by physicians with primary specialties designated under the statute. *See id.*

52.     The Medicaid Enhanced Payment Statute defines "primary care services" as "(1) evaluation and management services that are procedure codes (for services covered under [Medicare]) for services in the category designated Evaluation and Management in the Healthcare Common Procedure Coding System (established by the Secretary under section 1395w-4(c)(5)[1] of this title as of December 31, 2009, and as subsequently modified); and (2) services related to immunization administration for vaccines and toxoids for which CPT codes 90465, 90466, 90467, 90468, 90471, 90472, 90473, or 90474 (as subsequently modified) apply under such System."

---

[1] "[S]ection 1395w-4(c)(5)" refers to the portion of the Medicare law that explains how payment for physician services will work.

53.     The purpose of the Medicaid Enhanced Payment Statute was to benefit physicians that provide primary care services to the Medicaid population by increasing payments rates for 2013 and 2014.   In the Congressional Report, Congress stated that the enhancements were necessary because:

> "These low Medicaid payment rates do not provide adequate incentives for physicians to participate in Medicaid, limiting access to physicians' services by Medicaid beneficiaries. In addition, low Medicaid payment rates discourage young physicians and other health professionals from entering careers in primary care, undermining efforts to address the shortage of primary care practitioners in many areas of the country."

H.R. REP. No. 111-299, pt. 1, at 617 (2009).

54.     Access to primary care is critical for ensuring continuity of care, improving overall health and reducing health care costs.

## II.     CMS's Final Rule is Contrary to the Statute.

55.     On November 6, 2012, CMS adopted the Final Rule codified at 42 C.F.R. § 447.400(a)(2) that restricted increased payments authorized under the Medicaid Enhanced Payment Statute to only those physicians who were either board-certified in certain specialties or who satisfied a sixty-percent-threshold requirement – even though Congress omitted such requirements from the statute.

56.     The Final Rule states, among other things:

(a) States pay for services furnished by a physician as defined in § 440.50 of this chapter, or under the personal supervision of a physician who self-attests to a specialty designation of family medicine, general internal medicine or pediatric medicine or a subspecialty recognized by the American Board of Medical Specialties (ABMS), the American Board of Physician Specialties (ABPS) or the American Osteopathic Association (AOA). Such physician then attests that he/she:

(1) Is Board certified with such a specialty or subspecialty and/or

(2) Has furnished evaluation and management services and vaccine administration services under codes described in paragraph (b) of this

section that equal ***at least 60 percent of the Medicaid codes he or she has billed during the most recently completed CY*** or, for newly eligible physicians, the prior month.

(b) At the end of CY 2013 and 2014 the Medicaid agency must review a statistically valid sample of physicians who received higher payments to verify that they meet the requirements of paragraph (a)(1) or (2) of this section.

42 C.F.R. § 447.400(a)(2) (emphasis added).

57. The sixty-percent-threshold requirement embodied in the Final Rule is directly contrary to the plain language of Medicaid Enhanced Payment Statute, § 1396a(a)(13)(C), which imposed no such limitations on eligibility for the increased Medicaid payments. The Final Rule restricts the increased payments to only a sub-population of primary care physicians, while excluding others who would have otherwise been eligible under the statute. Specifically, the proposed regulation improperly prohibits increased Medicaid payments to non-board-certified physicians who billed less than 60 percent of certain Medicaid billing codes in the prior year, regardless of whether those physicians practice the specialties designated by the Medical Enhancement Statute. 42 C.F.R. § 447.400(a)(2).

58. CMS attempted to justify this improper sixty-percent-threshold requirement by citing to another unrelated statute, without recognizing that Congress intentionally omitted the sixty-percent-threshold requirement from the Medicaid Enhanced Payment Statute. Indeed, CMS admitted that it imported the sixty-percent-threshold requirement from a Medicare statute and sought to apply it to the Medical Enhancement Statute, where Congress imposed no such requirement. CMS wrote:

We developed this [60 percent threshold] proposal for the use of a supporting history of codes billed to qualify physicians for increased payment after reviewing the ***statutory requirements for the Medicare Incentive Payments for Primary Care Services payments authorized by section 5501(a) of the Affordable Care Act***, which amended section 1833 of the Act. That provision ***specifically requires that primary care services account for at least 60 percent of the allowed charges***

*billed* by a practitioner for services to be eligible for increased payment. We propose that the same standard be applied to the Medicaid payments under section 1902(a)(13)(C) of the Act although we propose that verification would be based on the number of codes billed for the specified primary care services, rather than charges.

CMS-2370-P, p. 17.

59. Comparison of the plain statutory language of the Medicaid Enhanced Payment Statute and Medicare Incentive Payments for Primary Care Services ("MIPPCS") makes clear that Congress did not intend for the sixty-percent-threshold requirement to apply to payments under the Medicaid Enhanced Payment Statute.

60. First, while Congress was certainly aware of the sixty-percent-threshold requirement in MIPPCS, which was passed the week before the Medicaid Enhanced Payment Statute, it intentionally omitted that language from the Medicaid Enhanced Payment Statute.

61. Second, MIPPCS applies only to "primary care practitioner[s]" as defined by that statute. In contrast, the Medicaid Enhanced Payment Statute applies to any "physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine," which may or may not meet the specific definition of "primary care practitioner" contained in the MIPPCS. Indeed, the phrase "primary care practitioner" is not used anywhere in the Medicaid Enhanced Payment Statute. Accordingly, CMS's attempt to apply MIPPCS's definition of "primary care practitioner" to the Medicaid Enhanced Payment Statute is contrary to that statute.

62. Third, MIPPCS explicitly imposes two independent criteria to be a qualifying practitioner, but Congress decided to impose only one of those criteria to payments under the Medicaid Enhanced Payment Statute. MIPPCS's criteria are: (1) "a physician . . . has a primary specialty designation of" certain listed specialties "and" (2) at least 60 percent of the physician's

"allowed charges" are "primary care services." § 1395l(x)(2)(A). The word "and" joining these criteria signifies Congress's intent to create two independent eligibility standards in the MIPPCS. Given that these are separate criteria, a sixty-percent-threshold requirement (or any percentage threshold requirement) cannot be implied from the phrase "physician with a primary specialty designation" in the Medicaid Enhanced Payment Statute. Otherwise, the language at § 1395l(x)(2)(A)(ii) would be rendered completely meaningless, and courts should not interpret statutes in a way that would render statutory language meaningless. *See Williams v. Taylor*, 529 U.S. 362, 364 (2000) (explaining that it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute").

63. For all these reasons, the sixty-percent threshold requirement embodied in the Final Rule is contrary to the statute and, therefore, invalid.

### III. CMS Arbitrarily and Capriciously Ignored Comments Protesting the Sixty-Percent-Threshold Requirement.

64. During the notice and comment period for the Final Rule, CMS received multiple comments opposing the proposed sixty-percent-threshold requirement, and those commenters correctly pointed out that imposing a threshold on non-board-certified physicians would be contrary to the statute and would result in inequitable results contrary to statutory intent.

65. The Department of Public Welfare for the Commonwealth of Pennsylvania wrote in its comment on the proposed rule:

> [T]he proposed "60% requirement" that CMS has drawn from Medicare's incentive bonus payment for physician primary care services . . . was ***not evident in the ACA language*** and not anticipated by state staff. ***If the intent of the ACA was to infuse the Medicare incentive bonus payment criteria into the enhanced Medicaid payment criteria, then that should have been clear in the law.***

> The Department requests that CMS reconsider this proposed requirement because it creates inequality between a Board certified and non-Board certified physician in that a physician who is Board certified will automatically be eligible for the

increased payment although he/she may only be providing 10 percent of his/her services in a primary care capacity. However the non-Board certified provider may be providing 50 percent but not qualify for the increased payment. This is *not consistent with the intent of the statutory language in the ACA*.

(Ex. A, 6/11/2012 V. Gordon Letter (emphasis added).)

66. The Department of Health and Hospitals for the State of Louisiana wrote:

[T]he CFR language does not align with the current statutory definition of primary care providers under section s. 1905(t) of the SSA, which specifies general practitioner, family medicine physician, internal medicine physician, obstetrician/gynecologist, or pediatrician. As a result, non-certified physicians who do not meet the 60 percent threshold and are currently considered or registered as primary care providers will not be eligible for the increase in payment.

. . . .

[T]he State is concerned that the standards will result in inequitable determinations and result in providers who have traditional[ly] been recognized and served as primary care providers being ineligible for the payment.

. . . .

Due to technical issues, the 60 percent threshold will undoubtedly result in the unintended consequences of omitting physicians who have traditionally served as an individual's primary care provider. For example, the draft rule would pay the increased rate to a certified subspecialist, regardless of volume, yet exclude a non-certified physician whose billing history demonstrate that 59% were within the designated service codes. While the State believes that services rendered by a subspecialist are valuable, the example demonstrates one potential inequitable result of the rule.

In the preamble to the proposed rule, CMS noted the 60 percent service requirement is designed to align Medicaid with the statutory requirements for the Medicare Incentive Payments for Primary Care Services authorized by section 5501(a) of the Affordable Care Act, which amended section 1833 of the Act, which specifically requires that primary care services account for at least 60 percent of the allowed charges billed by a practitioner for services to be eligible for increased payment. However, the State respectfully submits that the application of the 60 percent service requirement is misapplied in the regulation. Specifically, the Medicare provision under 1833 is identified as an "incentive" and provides for 10 percent increase in payment. It is common for "incentives" to be based on performance targets or other criteria such as minimum service utilization. The characterization as an incentive is distinctly different from

establishing a minimum payment as specified in the newly created section of 447.405.

As such, to require 60 percent does not appear to align with the statutory intent that E&M services rendered are paid at least at the Medicare rate. Furthermore, *had Congress sought to align the two payment provisions, it could have included the language in section 1833 in the corresponding provision in Medicaid law given that the language was readily available*.

(Ex. B, 6/11/2012 J. Kennedy Letter (emphasis added).)

67.     The National Association of Medicaid Directors wrote:

CMS noted the 60 percent service requirement is designed to align Medicaid with the statutory requirements for the Medicare Incentive Payments for Primary Care Services authorized by section 5501(a) of the ACA, which amended Section 1833 of the SSA that specifically requires that primary care services account for at least 60 percent of the allowed charges billed by a practitioner for services to be eligible for increased payment. Medicaid Directors do not agree that it is appropriate to designate a threshold. We believe that *if Congress had sought to align the two payment provisions, it would have included the language in Section 1833 in the corresponding provision in Medicaid law.*

(Ex. C, 6/11/2012 A. Allison Letter (emphasis added).)[2]

68.     The Department of Health Services for the State of Wisconsin wrote:

In the Preamble to the proposed rule, CMS noted the 60% service requirement is designed to align Medicaid with the statutory requirements for the Medicare Incentive Payments for Primary Care Services (authorized by section 5501(a) of PPACA), found in Section 1833 of the SSA, specifically requiring primary care services account for at least 60% of the allowed charges billed by a practitioner for services account for at least 60% of the allowed charges billed by a practitioner for services to be eligible for increased payment. This requirement is not included [in] the corresponding Medicaid provisions of the law. Furthermore, the Medicare provision under SSA Section 1833 is labeled an "incentive" and provides for a 10% increase in payment. There is no such performance target associated with the Medicaid increase; Congress established a minimum payment as specified in the newly created section of 447.405. As such, *the 60% threshold does not appear to align with the provision. These inconsistencies are problematic, and likely require Congressional action to resolve.*

(Ex. D, 6/11/2012 D. Smith Letter (emphasis added).)

---

[2] The letter from the National Association of Medicaid Directors was co-signed by Darin J. Gordon, TennCare Director, in his capacity as Vice President of the National Association of Medicaid Directors.

69.     Despite these valid concerns raised about the sixty-percent-threshold requirement during the notice and comment period, CMS essentially ignored these concerns when adopting the Final Rule.

70.     With respect to the multiple concerns that the sixty-percent-threshold requirement is contrary to the plain language of the Medicaid Enhanced Payment Statute and Congress's intent when enacting it, CMS merely provided the inadequate and conclusory statement that "we often use Medicare program standards in developing policy for the Medicaid program, and we believe that it is appropriate to apply the 60 percent threshold applicable to the Medicare primary care incentive payment to the Medicaid payment as well."  RIN 0938-AQ63, 77 FR 66670-01.

71.     CMS's unsupported, conclusory dismissal fails to meaningfully address the legitimate concerns raised by the commentators that CMS lacked statutory authority to impose the sixty-percent-threshold requirement.  CMS's lack of any substantive explanation as to how its actions were supported by the statute supports findings that the sixty-percent-threshold requirement in the Final Rule is both contrary to the statute and arbitrary and capricious.

## IV.     The Final Rule's Reliance on Billed Codes is Arbitrary and Capricious.

72.     When enacting the Final Rule, CMS completely failed to consider that the use of billed codes with respect to the sixty-percent-threshold requirement arbitrarily and capriciously harms the very providers that the statute was enacted to benefit.

73.     The Final Rule capriciously discriminates among physicians providing identical primary care services to similarly-situated patients based exclusively on differences in administrative billing.

74.     By relying on billed codes, payment under the Final Rule depends not on the percentage of the total services furnished by that physician, but as a percentage of all services

billed under the physician's provider number, regardless of whether those services were furnished by that physician.

75. The Final Rule does not account for the fact that many physicians practicing primary care – particularly in rural clinics – typically bill under the physician's provider number for a reasonably large volume of ancillary services (*i.e.*, urine testing, blood work, X-rays) furnished by other professionals under the physician's supervision. This common practice skews the ratio used to calculate the sixty-percent-threshold in a way that creates an inaccurate classification of these physician practices in the context of the Final Rule and inappropriately excludes them from receiving the enhanced Medicaid payments.

76. Furthermore, group practices with more than one physician typically bill for ancillary services under the group provider number (because the group typically bears the expense of, and obtains any necessary certifications for, the technical component of such ancillary services), whereas solo practitioners must bill all ancillary services under their own provider number. This means that a physician's status as a group practice physician or a solo practitioner could determine whether a particular physician satisfies the sixty-percent-threshold requirement, even though the professional services performed by the physician would be the same in either case. The Final Rule, therefore, arbitrarily discriminates between physicians who practice in groups and sole practitioners.

77. Consequently, a significant number of physicians, including many solo practitioners and rural physicians who provide vital primary care services to traditionally underserved and vulnerable populations with few options for medical care, are arbitrarily excluded from the increased payments entitled to them by Congress.

78. This discriminatory Final Rule is not a reasonable interpretation of Congress's intent to enhance payments to physicians with primary care designations.

79. Although CMS gleaned the sixty-percent-threshold requirement in the Final Rule from MIPPCS, measurement of the sixty-percent-threshold under MIPPCS is based on "allowed charges," whereas measurement of the sixty-percent-threshold under the Final Rule is based on "codes billed." This discrepancy provides further evidence of the inaccuracy and arbitrariness of including all codes billed, even non-professional ancillary services, in the denominator of the sixty-percent-threshold determination.

80. Moreover, CMS's own sub-regulatory guidance indicates that the sixty-percent-threshold was intended to be based on the total *professional* services performed or supervised by the physician, not on the total codes billed under that physician's number. For example, in the preamble commentary to the Final Rule, CMS notes that "[m]any commenters expressed concern with the requirement that services be billed under the physician's billing number." 77 Fed. Reg. 66677. CMS also recognized that, "[i]n the case of a group practice, the claim would most likely be billed under the practice number and not the physician's number." Therefore, CMS decided to "[remove] the requirement that services be billed under the physician's billing number." *Id.* CMS's comments indicate that its focus was on services performed, not on which billing number happened to be used. Thus, CMS's use of the phrase "60 percent of the Medicaid codes he or she has billed" should be read to refer to the universe of professional services performed by or under the supervision of the physician, not on the universe of codes that happen to be captured by a particular billing number. Yet, CMS applied its Final Rule contrary to its own sub-regulatory guidance in this matter.

81.     As another example, a Q&A document from CMS's website (https://www.medicaid.gov/affordablecareact/provisions/downloads/qs-and-as-on-1202-iii-1-30-13.pdf) contains the following:

> Q:     Community clinics in my state (clinics other than FQHCs and RHCs) are reimbursed at the same rate as a physician. They do not receive a bundled or encounter rate. Are they eligible for the higher payment? Would they have to attest that 60 percent of the services provided in the clinic are within the qualifying E&M codes? Are they required to pass through any increased payments in the form of higher wages for the health care professionals they employ?

> A:     Higher payment made under the requirements of the regulation is for physicians reimbursed pursuant to a physician fee schedule.  A physician working in a clinic and reimbursed through a physician fee schedule could qualify for higher payment if he or she is appropriately Board certified or if **60 percent of the services that he or she provides** is for the specified primary care services. Since the clinic itself is not eligible, this percentage of services threshold cannot be based on the aggregate of all services provided by all practitioners within the facility, only on services [sic] the individual physicians.

(emphasis added).  The above website content demonstrates that the 60 percent threshold should be based on the universe of professional services performed, not on the universe of codes that happen to be billed under a particular provider number.  The use of a particular provider number to bill certain codes depends on practice setting, state rules and payer requirements.  Thus, it does not accurately represent a "physician's practice characteristics" for purposes of determining if the physician can accurately claim "a specialty designation of family medicine, general internal medicine, or pediatric medicine."  See 77 Fed. Reg. at 66673.

82.     Unsurprisingly, calculating sixty percent of allowed charges leads to different results than calculating sixty percent of codes billed.  As multiple commentators pointed out during the notice and comment period, altering the borrowed MIPPCS provision to measure the sixty-percent-threshold based on billed codes instead of allowed charges was arbitrary and capricious and undermined Congress's purpose for enacting the statute.

83.     In other words, CMS not only lifted an improper requirement from another statute and applied it where Congress did not intend, CMS also inexplicably manipulated that inapplicable requirement in a way that produces absurd results contrary to the intent of the Medicaid Enhanced Payment Statute.

84.     For example, consider a common scenario in which a female Medicaid beneficiary visited her primary care provider for an annual check-up.  If the physician ordered a pregnancy test and a simple blood test to check for anemia – both processed by clinic staff but billed under the physician's provider number – then 66 percent of codes billed for that visit would not constitute billing codes designated under the Final Rule.  As a result of including non-professional ancillary services in the denominator of the sixty-percent-threshold calculation, the physician in this example would be ineligible increased payment under the Final Rule, despite the undisputable facts that the physician fits squarely within the parameters of the Medicaid Enhanced Payment Statute and provided primary care services to a Medicaid beneficiary, which Congress intended to incentivize with the Medicaid Enhanced Payment Statute.  This result is clearly contrary to the Medicaid Enhanced Payment Statute.

85.     Further, for purposes of the sixty-percent-threshold requirement in the Final Rule, a $5.00 strep test would be treated with equal weight as a complex office visit in which a physician spent an hour treating a patient.

86.     These nonprofessional ancillary services, such as diagnostic testing and simple imaging often administered by nurses or technicians, are completely irrelevant to whether the physician predominately practices primary care.  However, a literal interpretation of the sixty-percent-threshold requirement in the Final Rule makes the volume of ancillary services billed

24

under a physician's provider number a determining consideration as to whether a physician can receive increased payments.

87.    CMS's use of billed codes to determine whether providers satisfy the sixty-percent-threshold requirement was arbitrary and capricious – not a reasonable interpretation of Congressional intent.

88.    During the public comment period, multiple commenters pointed out these arbitrary and capricious flaws in with CMS's proposed rule, but CMS ignored these concerns without explanation.

89.    For example, the American College of Physicians wrote:

[t]he College recommends that the 60% criteria should be based on allowed charges rather than percent of billing codes—this would be consistent with the definition used under the Medicare Primary Care Bonus provision of the ACA and would be less likely to in appropriately exclude those physicians who truly provide primary care services, but are also required to provide a broad range of other services due to the limited availability of other clinicians in the area e.g. in rural and similar underserved areas.

(Ex. E, 6/11/2012 R. Gluckman Letter.)

90.    The American College of Chest Physicians wrote:

[W]e recommend that the use of allowed charges be used rather than percentage of billing codes. This would prevent the exclusion of those physicians that must provide other services in areas where clinician availability is limited. We understand that this method would be consistent with the definition used under the Medicare Primary Care Bonus provision of the Patient Protection and Affordable Care Act of 2010.

(Ex. F, S. Raoof Letter.)

91.    CMS completely ignored those comments raising concerns about using billed codes as the operative metric, instead of allowed charges, to calculate the sixty-percent-threshold and provided no explanation when enacting the Final Rule. CMS's lack of response to these comments further supports a finding that it acted arbitrarily and capriciously.

## V.    TennCare Seeks to Recoup Money From the Physicians as a Direct Result of the Unlawful, Arbitrary and Capricious Sixty-Percent-Threshold Rule.

92.    As mandated by the Final Rule, TennCare reviewed the billed codes of Tennessee physicians who received increased payments under the Medicaid Enhanced Payment Statute to determine whether they satisfied the criteria established in the Final Rule.

93.    During 2013 and 2014, the Physicians were not board-certified with a specialty or subspecialty listed in subsection (a) of the Final Rule.  The Physicians are experienced primary care practitioners, some with thirty or more years of experience, and some began practice when specialty board certification was not common or required for licensure or hospital privileges. Furthermore, some of the Physicians were deterred from obtaining or continuing board certification by the high cost of certification and recertification.

94.    After reviewing billing codes for services provided to Medicaid beneficiaries in 2013 and 2014, TennCare determined that the Physicians did not satisfy the sixty-percent-threshold requirement in the Final Rule.

95.    Despite the fact that many if not all of the Physicians satisfied the sixty-percent-threshold requirement in the MIPPCS, based on allowed charges, and qualified for increased Medicare payments under that statute, TennCare found that they did not satisfy the sixty-percent-threshold requirement of the Final Rule, based on billed codes (including billed codes for non-professional ancillary services).

96.    In its effort to carry out the Final Rule, TennCare endeavors to recoup from the Physicians the increased payments made under the Medicaid Enhanced Payment Statute. Proposed recoupments from the Physicians total $2,368,147.15.  The prospect of repaying this money is daunting for many of the Physicians, some of which may be forced to close clinics if

the recoupment is carried out. This unfortunate and unintended consequence illustrates the arbitrary and capricious nature of the Final Rule.

97.     On behalf of Tennessee providers, the Tennessee Medical Association ("TMA") wrote a series of letters to CMS objecting to the absurd and unfortunate outcome of the arbitrary and capricious Final Rule.  (Ex. G, 12/21/2015 TMA Letter.)

98.     In its response to the TMA, CMS conceded that the statute did not require "criteria for eligibility for enhanced Medicaid primary care payments" and that the criteria had been imposed solely as the result of CMS's regulation.  (Ex. H, 1/19/2016 J. Glaze Letter.)

99.     According to CMS, the Final Rule mandates that TennCare recoup the increased Medicaid payments from the Physicians if they did not meet the sixty-percent-threshold requirement, based on billed codes, in the Final Rule.  (Ex. H, 1/19/2016 J. Glaze Letter.)

100.    CMS misinformed the TMA that during the notice and comment period, "CMS received only one comment on the threshold and its application and that commenter suggested that there be no threshold at all."  (Ex. H, 1/19/2016 J. Glaze Letter.)  As demonstrated above, that statement is false.

101.    In fact, multiple commentators objected to the proposed methodology used to calculate the sixty-percent-threshold requirement.  (*E.g.*, Ex. E, 6/11/2012 R. Gluckman Letter; Ex. F, S. Raoof Letter.)  While CMS completely failed to address those comments during in its final rulemaking procedures, the concerns were indeed raised.

102.    Further, as demonstrated above, multiple commenters – not just one as CMS claimed – objected to CMS's improper imposition of a threshold requirement not supported by the statute.  (*E.g.*, Ex. A, 6/11/2012 V. Gordon Letter; Ex. B, 6/11/2012 J. Kennedy Letter; Ex. C, 6/11/2012 A. Allison Letter; Ex. D, 6/11/2012 D. Smith Letter.)

27

103.    The fact that CMS was apparently unaware that these comments even existed demonstrates that CMS could not possibly have appropriately considered or adequately addressed those comments during the final rulemaking process, which further supports a finding that the Final Rule was arbitrary and capricious.  *See* 5 U.S.C. § 553(c) (requiring that the agency must consider "the relevant matter presented" during the notice and comment period when adopting the final rule).

## VI.    The Physicians' Will Seek to Stay Their State Administrative Appeal of TennCare's Recoupment Pending This Litigation.

104.    The Physicians contested TennCare's recoupment efforts in a consolidated TennCare Provider Appeal currently pending before the Commissioner of the Tennessee Department of Finance and Administration.

105.    TennCare's audit and recoupment efforts against the Physicians are based specifically on the sixty-percent-threshold requirement in the Final Rule.

106.    Unlike this Court, neither TennCare nor the Tennessee Department of Finance and Administration have jurisdiction or authority to overrule CMS's Final Rule or declare it invalid.

107.    If the Court invalidates the sixty-percent-threshold requirement in the Final Rule as contrary to the statute or arbitrary and capricious, then TennCare's audit and recoupment efforts against the Physicians would likewise be invalidated.

108.    The Physicians advised TennCare and the Tennessee Department of Finance and Administration that they would be challenging the validity of the Final Rule in federal court.

109.    The Physicians also advised TennCare and Tennessee Department of Finance and Administration that, following the filing of this lawsuit, the Physicians plan to request a stay of the TennCare Provider Appeal, and any potential recoupment efforts against the Physicians by

TennCare based upon the sixty-percent-threshold requirement in the Final Rule, pending the outcome of this lawsuit

## COUNT I
## VIOLATION OF THE APA BECAUSE THE FINAL RULE IS
## CONTRARY TO STATUTE, ARBITRARY AND CAPRICIOUS

110.    The Physicians reallege and incorporate by reference paragraphs 1 through 109 as if fully set forth below.

111.    The Final Rule is subject to judicial review under the APA because it is a final agency action within the meaning of 5 U.S.C. § 704.

112.    Under 5 U.S.C. § 706(2), a "reviewing court shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (*id.* § 706(2)(A)); is "contrary to constitutional right, power, privilege, or immunity" (*id.* § 706(2)(B)); or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (*id.* § 706(2)(C)).

113.    The Final Rule is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because – as explained above – it conflicts with the statute codified at 42 U.S.C. § 1396a(a)(13)(C).

114.    Defendants also did not adequately consider the alternatives to the sixty-percent-threshold requirement in the Final Rule or provide reasons for rejecting alternatives articulated in comments.

115.    Specifically, CMS failed to meaningfully consider or respond to comments that the sixty-percent-threshold requirement would produce arbitrary results, would harm the very providers that the statute was enacted to benefit, and was not authorized by statute. (*See, e.g.*, Ex. A, 6/11/2012 V. Gordon Letter; Ex. B, 6/11/2012 J. Kennedy Letter; Ex. C, 6/11/2012 A.

Allison Letter; Ex. D, 6/11/2012 D. Smith Letter; Ex. E, 6/11/2012 R. Gluckman Letter; Ex. F, S. Raoof Letter.)  As such, CMS did not meaningfully consider the "relevant matter presented," 5 U.S.C. § 553(c), and the Final Rule was not based upon consideration of the relevant factors.

116.    Defendants did not adequately consider proposed alternatives to the billed charges methodology for calculating the sixty-percent-threshold in the Final Rule or provide reasons for rejecting alternatives, such as basing the calculation on allowed charges as in the MIPPCS, articulated in comments.

117.    CMS's Final Rule was adopted "without observance of procedure required by law," 5 U.S.C. § 706(D).  It constitutes agency action that is arbitrary or capricious and, therefore, should be held unlawful and set aside pursuant to the APA.

118.    The Physicians are entitled to a declaration that those aspects of the Final Rule requiring providers to satisfy the sixty-percent-threshold requirement in order to receive increased payments under the Medicaid Enhanced Payment Statute are not in accordance with law, and/or are arbitrary and capricious, and an order declaring that payments made under the Medicaid Enhanced Payment Statute should not be recouped based on upon failure to satisfy the sixty-percent-threshold requirement in the Final Rule.

119.    The Physicians are entitled to a declaration that those aspects of the Final Rule requiring providers to satisfy the sixty-percent-threshold requirement in order to receive increased payments under the Medicaid Enhanced Payment Statute are arbitrary and capricious, and an order declaring that payments made under the Medicaid Enhanced Payment Statute should not be recouped based on upon failure to satisfy the sixty-percent-threshold requirement.

## COUNT II
## DECLARATORY JUDGEMENT

120.    The Physicians reallege and incorporate by reference paragraphs 1 through 119 as if fully set forth below.

121.    The Final Rule is subject to judicial review because it is a final agency action within the meaning of 5 U.S.C. § 704.

122.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, in a case of "actual controversy within its jurisdiction," "any court of the United States . . . may declare the rights and other legal relations of any party seeking such declaration."

123.    The Physicians bring an actual controversy within the jurisdiction of this Court because they have been, and will be, injured as a direct result of Defendants' action in promulgating the Final Rule.  As a direct result of the Final Rule, the Physicians could collectively be forced to pay back $2,368,147.15 as a direct result of a regulation that is unlawful, arbitrary, capricious, and contrary to the statute.

124.    The Court should protect the Physicians' rights not to be subjected to agency action that is contrary to law, in excess of statutory authority, arbitrary, or capricious. The Final Rule represents agency action that violates those rights because it conflicts with the language of a federal statute and constitutes arbitrary and capricious agency action, among other reasons, for lack of adequate reasoning and response to comments.

125.    Accordingly, the Physicians are entitled to a declaratory judgment that those aspects of the Final Rule requiring providers to meet the sixty-percent-threshold requirement as set forth in that rule in order to receive increased payments under the Medicaid Enhanced Payment Statute violate the APA, were promulgated *ultra vires* and contrary to law, and constitute arbitrary and capricious agency action.

## PRAYER FOR RELIEF

In view of the foregoing, the Physicians respectfully pray that this Court:

1.     Declare that the Final Rule is unlawful insofar as it requires the Physicians to meet the sixty-percent-threshold requirement as set forth in that rule in order to receive increased payments under the Medicaid Enhanced Payment Statute;

2.     Declare that the Physicians are not required to refund reimbursement payments received pursuant to the Medicaid Enhanced Payment Statute by reason of the invalid sixty-percent-threshold requirement in the Final Rule;

3.     Issue an order granting injunctive relief in favor of the Physicians and against Defendants preventing enforcement of the sixty-percent-threshold requirement in the Final Rule;

4.     Award the Physicians their costs and expenses, including reasonable attorneys' fees; and

5.     Award such further additional relief as is just and proper.


**DATED** this 31st day of October, 2016.

Respectfully submitted,

*/s/ David A. King*

_____
David A. King (BPR# 11559)
Brittain W. Sexton (BPR# 27525)
Alison K. Grippo (BPR# 29601)
**BASS, BERRY & SIMS PLC**
150 Third Avenue South, Suite 2800
Nashville, TN  37201
(615) 742-6200
(615) 742-2842 (facsimile)
*Attorneys for Plaintiffs*