UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANDREW AVERETT, *et al.*,

        Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES, *et al.*,

        Defendants.

_____/

Civil Action No. 16-cv-02815

Hon. Matthew F. Leitman

## OPINION AND ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF #22); (2) DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF #29); AND (3) REMANDING TO THE CENTERS FOR MEDICARE AND MEDICAID SERVICES FOR FURTHER PROCEEDINGS

In this action, a group of Tennessee physicians who provide primary care services to Medicaid recipients seek to invalidate an administrative rule adopted by the Centers for Medicare and Medicaid Services ("CMS"). The rule relates to a physician's eligibility for enhanced payments for primary care services under Medicaid. The parties have filed cross-motions for summary judgment. (*See* Pls.' Mot. for Summ. J., ECF #22; Defs.' Cross-Mot. for Summ. J., ECF #29.) For the reasons explained below, the Court **GRANTS** Plaintiffs' motion and **DENIES** Defendants' motion.

# I

## A

In March 2010, Congress passed, and President Barack Obama signed, comprehensive healthcare reform legislation known as the Affordable Care Act (the "ACA"). The ACA was designed to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). The ACA "was not one single health care bill that became law, but two – the initial health care legislation, the Patient Protection and Affordable Care Act (PPACA), and the Health Care and Education Reconciliation Act of 2010 (HCERA), passed almost immediately after the PPACA to amend that legislation." John Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 Law Libr. J. 131, 133–34 (2013). Congress passed the PPACA on March 21, 2010, and President Obama signed it into law on March 23, 2010. Congress passed the HCERA on March 25, 2010, and President Obama signed that bill into law on March 30, 2010.[1]

Among other things, the ACA incentives physicians to provide primary care services to vulnerable populations. It does so by authorizing enhanced payments to certain doctors who provide primary care to participants in Medicare and Medicaid.

---

[1] For ease of reference, when the Court refers to the HCERA and PPACA collectively in this Opinion and Order, it will use the term "ACA."

These increased payments are set out in two separate ACA provisions, one for Medicare and another for Medicaid.

The provision that authorizes increased payments for primary care services under Medicare appears in Section 5501 of the PPACA, 42 U.S.C. § 1395l(x) (the "Medicare Payment Statute"). The Medicare Payment Statute authorizes enhanced payments to "primary care practitioners" for "primary care services furnished on or after January 1, 2011, and before January 1, 2016 . . . ." It defines the term "primary care practitioner" as a physician (1) "who has a primary specialty designation of family medicine, internal medicine, geriatric medicine, or pediatric medicine" and (2) "for whom primary care services accounted for at least 60 percent of the allowed charges" under Medicare during a prior period of time determined by the Secretary of Health and Human Services.[2]

_____

[2] The relevant text of the Medicare Payment Statute provides:

> (1) In general

> In the case of primary care services furnished on or after January 1, 2011, and before January 1, 2016, by a primary care practitioner, in addition to the amount of payment that would otherwise be made for such services under this part, there also shall be paid (on a monthly or quarterly basis) an amount equal to 10 percent of the payment amount for the service under this part.

> (2) Definitions

> In this subsection:

> (A) Primary care practitioner

The provision that authorizes increased payments for primary care services under Medicaid appears in Section 1202 of the HCERA, 42 U.S.C. § 1396a(a)(13)(C) (the "Medicaid Payment Statute"). Like the Medicare Payment Statute, the Medicaid Payment Statute authorizes enhanced payments to physicians with certain specified "primary specialty designation[s]" – essentially the same designations listed in the Medicare Payment Statute.[3] But unlike the Medicare Payment Statute, the Medicaid Payment Statute does not require physicians to meet

---

The term "primary care practitioner" means an individual--

(i) who --

(I) is a physician (as described in section 1395x(r)(1) of this title) who has a primary specialty designation of family medicine, internal medicine, geriatric medicine, or pediatric medicine;

. . .

and

(ii) for whom primary care services accounted for at least 60 percent of the allowed charges under this part for such physician or practitioner in a prior period as determined appropriate by the Secretary.

42 U.S.C. § 1395l(x).

[3] The designations listed in each statute are identical with two minor exceptions. First, the Medicare Payment Statute includes the geriatric medicine designation and the Medicaid Payment Statute does not. This makes sense because Medicare is designed to provide medical care to elderly patients. Second, the Medicare Payment Statute refers to the "internal medicine" designation while the Medicaid Payment Statute refers to the "general internal medicine" designation.

any billing metric in order to qualify for the enhanced payments. In its entirety, the

Medicaid Payment Statute provides:

> A State plan for medical assistance must—
>
> . . .
>
> (13) provide --
>
> . . .
>
> (C) payment for primary care services (as defined in subsection (jj)) furnished in 2013 and 2014 by a physician with a primary specialty designation of family medicine, general internal medicine, or pediatric medicine at a rate not less than 100 percent of the payment rate that applies to such services and physician under part B of subchapter XVIII of this chapter (or, if greater, the payment rate that would be applicable under such part if the conversion factor under section 1395w-4(d) of this title for the year involved were the conversion factor under such section for 2009);

42 U.S.C. § 1396a(a).

## B

After Congress passed the ACA, CMS, an agency within the United States

Department of Health and Human Services, adopted rules to implement the

Medicare Payment Statute and the Medicaid Payment Statute.

CMS promulgated the final rule implementing the Medicare Payment Statute,

42 C.F.R. § 414.80(a), on November 29, 2010 (the "Final Medicare Payment Rule").

As relevant here, the Final Medicare Payment Rule confirms that a "primary care

practitioner" is eligible to receive enhanced Medicare payments for primary care services. 42 C.F.R. § 414.80(b). It further defines "eligible primary care practitioner" as a physician who satisfies two criteria:

> (A) Enrolled in Medicare with a primary specialty designation of 08–family practice, 11–internal medicine, 37–pediatrics, or 38–geriatrics.
>
> (B) At least 60 percent of the physician's allowed charges under the physician fee schedule (excluding hospital inpatient care and emergency department visits) during a reference period specified by the Secretary are for primary care services.

42 C.F.R. § 414.80(a)(i). Notably, the Final Medicare Payment Rule does not define the term "primary specialty designation" nor does it establish any criteria for determining whether a physician has one of the specified "primary specialty designations."

CMS promulgated the final rule implementing the Medicaid Payment Statute, 42 C.F.R. § 447.400(a), on November 6, 2012 (the "Final Medicaid Payment Rule"). The Final Medicaid Payment Rule authorizes enhanced Medicaid payments to a physician with one of the specified "primary specialty designation[s]" listed in the Final Medicaid Payment Statute. But, unlike the Final Medicare Payment Rule, the Final Medicaid Payment Rule narrowly defines the term "primary specialty designation." Under the Final Medicaid Payment Rule, a physician is deemed to

have one of the specified "primary specialty designation[s]" only if she attests that she:

> (1) Is Board certified with such a specialty or subspecialty [of family medicine, general internal medicine or pediatric medicine or a recognized subspecialty] and/or
>
> (2) Has furnished evaluation and management services and vaccine administration services under codes described in paragraph (b) of this section that equal at least 60 percent of the Medicaid codes he or she has billed during the most recently completed CY or, for newly eligible physicians, the prior month.

42 C.F.R. § 447.400(a). (For ease of reference, the Court will refer to the billing metric in subsection (2) of the Final Medicaid Payment Rule as the "60% Billing Code Threshold.")

CMS explained that it included the 60% Billing Code Threshold in the definition of "primary specialty designation" in part because Congress included a 60 percent allowed-charge threshold requirement in the Medicare Payment Statute:

> We developed this [60% Billing Code Threshold] proposal for the use of a supporting history of codes billed to qualify physicians for increased payment after review of the statutory requirements for the Medicare Incentive Payments for Primary Care Services payments authorized by section 5501(a) of the Affordable Care Act [*i.e.*, the Medicare Payment Statute] . . . . That provision specifically requires that primary care services account for at least 60 percent of the allowed charges billed by a practitioner for services to be eligible for increased payment. We propose that the same standard be applied to the Medicaid payments under section 1902(a)(13)(C) of the Act [*i.e.*, the Medicaid Payment Statute] although

we propose that verification would be based on the number of codes billed for the specified primary care services, rather than charges.

(Admin. R., ECF #21-2 at Pg. ID 305.)

During the notice and comment period for the Final Medicaid Payment Rule, a number of commentators objected that the 60% Billing Code Threshold was contrary to Congress' intent. These commentators highlighted that Congress included a billing metric in the Medicare Payment Statute but did not include such a provision in the Medicaid Payment Statute. The commentators argued that Congress' omission of a billing metric from the Medicaid Payment Statute under these circumstances demonstrated that Congress intended that the enhanced payments under Medicaid would be available regardless of whether physicians met any billing metric.[4]

---

[4] *See, e.g.*, Pennsylvania Dep't of Public Welfare Letter, Admin. R., ECF #21-6 at Pg. ID 692 ("The '60% requirement' was not evident in the [statute's] language and not anticipated by state staff. If the intent of the ACA was to infuse the Medicare incentive bonus payment criteria into the enhanced Medicaid payment criteria, then that should have been clear in the law."); Louisiana Dep't of Health and Hospitals Letter, Admin. R., ECF ## 21-7, 21-8 at Pg. ID 840-842 ("[T]o require 60 percent does not appear to align with the statutory intent that E&M services rendered are paid at least at the Medicare rate. Furthermore, had Congress sought to align the two Payment Statutes, it could have included the language in section 1833 [the Medicare Payment Statute] in the corresponding provision in Medicaid law given that the language was readily available."); Nat'l Assoc. of Medicaid Directors Letter, Admin. R., ECF #21-6 at Pg. ID 720 ("We believe that if Congress had sought to align the two Payment Statutes, it would have included the language in Section 1833 [the Medicare Provision] in the corresponding provision in Medicaid law.").)

CMS was unmoved by these objections. It responded that "we often use Medicare program standards in developing policy for the Medicaid program, and we believe that it is appropriate to apply the 60 percent threshold applicable to the Medicare primary care incentive payment to the Medicaid payment as well." (Admin. R., ECF #21-10 at Pg. ID 1077-78.)

## C

The Plaintiffs in this action are physicians who practice primary care medicine in Tennessee. Many of the Plaintiffs serve disadvantaged citizens in rural areas, and all of them participate in the Tennessee Medicaid program. The Tennessee Bureau of TennCare ("TennCare") administers the Tennessee Medicaid program.

In mid-2013, each Plaintiff attested to TennCare that he or she was eligible for the enhanced payments under the Medicaid Payment Statute and the Final Medicaid Payment Rule. Because none of the Plaintiffs are board certified, they attested that they had the required "primary specialty designation" based upon their billing histories. More specifically, they reported that 60 percent of their Medicaid claims for the prior year were for billing codes specified in the Final Medicaid Payment Rule. (*See, e.g.*, Ex. A to Decl. of Britain Sexton (the "Sexton Decl."), ECF #25-1 at Pg. ID 1176-77; Ex. B to Sexton Decl., ECF #25-2 at Pg. ID 1186-87.) In reliance upon Plaintiffs' attestations, TennCare paid Plaintiffs enhanced Medicaid payments for primary care services during 2013 and 2014.

In 2015, TennCare conducted an audit and determined that the Plaintiffs did not qualify for the increased Medicaid payments. (*See id.*) The audit found that Plaintiffs had not satisfied the 60% Billing Code Threshold. Therefore, TennCare concluded that Plaintiffs lacked the "primary specialty designation" necessary to make them eligible for the enhanced payments.[5] (*See id.*) TennCare then sought to recoup the payments made to the Plaintiffs.[6]

On October 31, 2016, the Plaintiffs filed this action against the United States Department of Health and Human Services, the Secretary of the United States Department of Health and Human Services, the Centers for Medicare and Medicaid Services, and the Administrator of the Centers for Medicare and Medicaid Services. (*See* Compl., ECF #1; Am. Compl., ECF #19.) The Plaintiffs allege that the Final Medicaid Payment Rule is invalid and that they were entitled to the enhanced payments for primary care services that they received. (*See id*.)

Plaintiffs' claims focus on the provision of the Final Medicaid Payment Rule that defines "primary specialty designation" by reference to whether the physician

---

[5] It appears that there may have been some confusion among Plaintiffs and other Tennessee primary care physicians concerning the language included on the attestation form that they completed, and this confusion seems to have contributed to the inaccurate attestations. The record contains a letter from the Tennessee Medical Association explaining the nature of the confusion. (*See* Exhibit E to Sexton Decl., ECF #25-5 at Pg. ID 1219.)

[6] TennCare later stayed its recoupment efforts pending the resolution of Plaintiffs' challenge to the Final Medicaid Payment Rule in this Court.

satisfied the 60% Billing Code Threshold. They contend that this aspect of the rule is "contrary to the text, purpose, and legislative history of the Medicaid [Payment Statute], harm[ful] [to] the very physicians whom Congress intended to benefit, and [] arbitrary and capricious." (Pls.' Memo in Support of Mot. for Summ. J., ECF #23 at Pg. ID 1123.) Plaintiffs insist that Congress did not intend that a physician would have to satisfy any billing threshold in order to qualify for enhanced payments for primary care services under the Medicaid Payment Statute. Plaintiffs ask the Court to "hold unlawful and set aside" the Final Medicaid Payment Rule on the ground that "it is contrary to [the Medicaid Payment Statute]." (Am. Compl. at ¶13, ECF #19 at Pg. ID 183.)

Plaintiffs filed a motion for summary judgment and supporting memorandum on May 19, 2017. (*See* ECF ## 22, 23.) Defendants filed a cross-motion for summary judgment and supporting memorandum on July 7, 2017. (*See* ECF ## 29, 29-1.) The Court held a hearing on the motions on October 30, 2017, and subsequently ordered supplemental briefing. (*See* ECF #39.) Both parties filed supplemental briefs. (*See* Defs.' Supp. Br., ECF #40; Pls.' Supp. Br., ECF #41.)

## II

"An agency's interpretation of a statute that is reflected in a regulation adopted through notice-and-comment rulemaking is reviewed using the two-step framework outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467

U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Metro. Hosp. v. U.S. Dep't of Health & Human Servs.*, 712 F.3d 248, 254 (6th Cir. 2013). At step one of a *Chevron* analysis, a court asks whether "Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. If Congress has spoken to the precise question at issue, then "the reviewing court must give effect to the will of Congress irrespective of any contrary agency interpretation." *Mid-Am. Care Found. v. N.L.R.B.*, 148 F.3d 638, 642 (6th Cir. 1998).

"[I]f the intent of Congress on a matter of statutory meaning is ambiguous, however, the court is to proceed to 'step two' of the *Chevron* inquiry: whether the agency's interpretation is a permissible construction of the statute." *Sierra Club v. U.S. E.P.A.*, 793 F.3d 656, 665 (6th Cir. 2015). At step two, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* (quotations omitted). Nevertheless, a reviewing court will not defer to an agency's construction if it is "arbitrary, capricious, or manifestly contrary to the statute." *Clark Reg'l Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 314 F.3d 241, 245 (6th Cir. 2002) (quotations omitted).

### III

### A

The Court begins its *Chevron* step one analysis by identifying the "precise question" presented by Plaintiffs' challenge to the Final Medicaid Payment Rule. That question is: does a physician's eligibility for enhanced payments for primary care services under the Medicaid Payment Statute relate to whether the physician satisfies any particular billing metric?  In answering that question, the Court uses "traditional tools" of statutory interpretation, including "analysis of the statutory text, the structure of the statute, and its legislative history." *Sierra Club*, 793 F.3d at 665.

As explained below, the relevant tools of statutory construction, taken together, point to one inescapable conclusion: Congress did *not* intend to link a physician's entitlement to enhanced Medicaid payments for primary care services to her billing history.  Accordingly, the Court properly resolves Plaintiffs' challenge to the Final Medicaid Payment Rule in Plaintiffs' favor at step one of *Chevron*.

### B

### 1

The Court starts its analysis of whether Congress has spoken to the precise question presented, as it must, by reviewing "the language of the statute itself." *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1059 (6th Cir. 2014)

(quotations omitted). As noted above, the Medicaid Payment Statute provides that "a physician with a primary specialty *designation* of family medicine, general internal medicine, or pediatric medicine" is eligible for increased Medicaid payments for primary care services. 42 U.S.C. § 1396a(a)(13)(C) (emphasis added).

Congress' use of the word "designation" signals that eligibility for the enhanced payments is not related to billing metrics. "In common usage, the term 'designate' means 'to make known directly.'" *Richardson v. C.I.R.*, 125 F.3d 551, 556 (7th Cir. 1997) (quoting Webster's Third New International Dictionary Unabridged 612 (1981)).[7] A "designation," in turn, is "[a]n official name, description, or title." Designation, *Oxford English Dictionary*, *available at* https://en.oxforddictionaries.com/definition/designation (last visited Jan. 12, 2018). The term "physician with a primary specialty designation" therefore indicates that someone (either the physician herself or another person or group) named or identified the physician as having a particular primary specialty. Nothing about the term suggests that it is linked to, or depends upon the satisfaction of, a billing metric.

Notably, CMS itself has used the term in this manner – *i.e.*, to mean a physician's self-labeling of her specialty irrespective of her billing history. As early as 2001, CMS required doctors enrolling in Medicare to "designate" their primary

---

[7] "In determining a term's ordinary meaning, dictionaries are a good place to start." *Ohio Dep't of Medicaid v. Price*, 864 F.3d 469, 475 (6th Cir. 2017) (quotations omitted).

"specialty(s)" in their applications. (*See* Pls.' Supp. Br., ECF #41 at Pg. ID 1418-19; 2001 CMS 855I Form, ECF #42-1 at Pg. ID 1446.) And in 2006, CMS again instructed physicians applying to participate in Medicare to "[d]esignate [their] primary specialty and all secondary specialty(s) [sic]." (2006 CMS 855I Form, ECF #42-2 at Pg. ID 1476.) CMS did not suggest on its forms that a physician's "primary specialty designation" was tied to whether the physician satisfied any particular billing metrics.[8]

For these reasons, Congress' use of the term "primary specialty designation" supports the conclusion that Congress did not intend to link a physician's entitlement to enhanced payments to her billing history. As explained below, that conclusion becomes inescapable when "primary specialty designation" and the Medicaid Payment Statute are construed in their proper context within the ACA.

---

[8] The Defendants have not presented any evidence that the term "primary specialty designation" was understood to refer to billing metrics at the time CMS used that term on the forms identified above. In the Court's Order requiring supplemental briefs, the Court requested that the parties identify any "meaning and usage of the term 'primary specialty designation' prior to the enactment of [the Medicaid Payment Statute] and [the Final Medicaid Payment Rule]." (ECF #39.) In response, Defendants stated that they were "unaware of any meaning of usage of 'primary specialty designation' prior to 42 U.S.C. § 1396a(a)(13)(C) [*i.e.* the Medicaid Payment Statute] and 42 C.F.R. § 447.400 [*i.e.* the Final Medicaid Payment Rule]." (Defs.' Supp. Br., ECF #40 at Pg. ID 1406.)

**2**

**a**

Congress' use of the term "primary specialty designation" in the Medicare Payment Statute confirms that it did not intend that that same term, as used in the Medicaid Payment Statute, would be linked to billing metrics. As noted above, the Medicare Payment Statute provides that "primary care practitioners" are eligible for increased Medicare payments. *See* 42 U.S.C. § 1395l(x)(2)(A). The Medicare Payment Statute then defines "primary care practitioner" as an individual who satisfies two conditions. First, the individual must be "a physician . . . who has a *primary specialty designation* of family medicine, internal medicine, geriatric medicine, or pediatric medicine . . . ." *Id.* (emphasis added). Second, the individual must be someone "for whom primary care services accounted for at least 60 percent of the allowed charges under this part . . . ." *Id.*

Critically, in the Medicare Payment Statute, Congress lists the physician's "primary specialty designation" and billing history as *separate* and *independent* elements of the "primary care practitioner" definition. Congress would not have done so if the term "primary specialty designation" already included a consideration of billing metrics. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be

superfluous, void, or insignificant." (quotations omitted)).  Thus, the term "primary specialty designation" as used in the Medicare Payment Statute is distinct and independent from a billing threshold or metric.

There is no reason to believe that Congress intended this same term to have a different meaning in the Medicaid Payment Statute.  The provisions were passed at essentially the same time by the same Congress; they each relate to a similar subject matter; and they have the same purpose – incentivizing physicians to provide primary care medical services to vulnerable populations.[9]  As the United States Court of Appeals for the District of Columbia Circuit has explained, where, as here,

---

[9] *See* "Payment changes and foreshadowing—Increased primary care payment: Medicare and Medicaid," *2011 Health L. Handbook* § 1:6 (noting that the "basic thrust" of the ACA "is that primary care should be valued more than it has been previously" and discussing the Medicare Payment Statute and Medicaid Payment Statute as examples); Admin. R., ECF #21-10 at Pg. ID 1074 (stating that the Medicaid Payment Statute is "intended to encourage primary care physicians to participate in Medicaid by increasing payment rates in CY 2013 and 2014"); Patricia Davis *et al.*, Cong. Research Serv., *Medicare Provisions in the Patient Protection and Affordable Care Act (PPACA): Summary and Timeline* 9, 69-70 (Jun 30, 2010), *available at* https://www.aamc.org/download/133858/data/crstimeline.pdf.pdf (stating that the PPACA through the Medicare Payment Statute "creates a new bonus payment for evaluation and management and certain general surgery services for five years beginning January 1, 2011, with the intent to expand access to primary care and general surgery services"); Karen Davis *et al.*, *How the Affordable Care Act Will Strengthen the Nation's Primary Care Foundation*, 26 J. Gen. Internal Med. 1201, 1201-02 (2011), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181291/pdf/11606_2011_Article _1720.pdf (noting that "[t]he Affordable Care Act begins to place greater value on primary care" and discussing the increased Medicare and Medicaid payments for primary services under the Medicare Payment Statute and the Medicaid Payment Statute, respectively).

Congress uses the identical term in provisions of the Medicare and Medicaid statutes that share a similar purpose, it follows that Congress intended the terms to have the same meanings. *See Adena Reg'l Med. Ctr. v. Leavitt,* 527 F.3d 176, 180 (D.C. Cir. 2008).

 *Adena* is particularly instructive. The court in *Adena* interpreted a provision of a Medicare statute governing payments to hospitals for treating a significantly disproportionate number of low-income patients. Under that provision, the payment amount was determined in part by the number of patients "eligible for medical assistance under a State plan approved under [Medicaid]." *Id.* at 178. To determine the meaning of "medical assistance" as used in that phrase, the D.C. Circuit looked to a similar provision in the Medicaid statute that also contained the same phrase, *i.e.*, "eligible for medical assistance under a State plan approved under [Medicaid]." *Id.* at 180. The court determined that it was proper to ascribe the same meaning to that phrase in both the Medicare and Medicaid provisions because, among other things, they served the same purpose:

> *The Medicaid and Medicare DSH provisions serve the same purpose*—to adjust payments to hospitals that serve a disproportionate share of poor patients—and in doing so each refers to patients "eligible for medical assistance under a State plan approved under" the Medicaid title of the Act. [ ] *It stands to reason the Congress intended the quoted phrase to have the same meaning in the two provisions.*

> We thus conclude HCAP patients do not obtain, and are not eligible for, "medical assistance" within the meaning of the Medicare DSH provision, wherefore the Hospitals' case must fail. As the Fourth Circuit has noted, *"[i]f Congress had wanted 'medical assistance' to take on a completely different meaning" in the Medicare DSH provision in Title XVIII than it has in the Medicaid statute, Title XIX, then the "Congress could easily have so indicated."*

*Id.* (citations omitted) (emphasis added).[10]  Just as in *Adena*, "it stands to reason" that Congress intended the term "primary specialty designation" to have the same meaning in the similarly-purposed and contemporaneously-enacted Medicaid Payment Statute and Medicare Payment Statute.

In addition, the term "primary specialty designation" in the Medicaid Payment Statute should be construed to have the same meaning as that same term in the Medicare Payment Statute because Congress had the Medicare statute in mind when it enacted the Medicaid Payment Statute.  We know that because the Medicaid Payment Statute expressly references the Medicare statute and specifically ties the minimum enhanced payment for primary care services under Medicaid to the minimum enhanced payment for such services under the Medicare statute. *See* 42 U.S.C. § 1396a(a)(13)(C) (specifying that a state Medicaid plan must provide payments to a "physician with a primary specialty designation of family medicine,

---

[10] The United States Court of Appeals for the Sixth Circuit cited *Adena* with approval in *Owensboro Health, Inc. v. United States Dep't of Health & Human Services*, 832 F.3d 615, 621–22 (6th Cir. 2016).

general internal medicine, or pediatric medicine at a rate not less than 100 percent of the payment rate that applies to such services and physician *under part B of subchapter XVIII of this chapter* [*i.e.*, under Medicare]" (emphasis added)). Where, as here, Congress cites the Medicare statute in a provision of the Medicaid statute and then includes in the Medicaid provision the same term it used in the cited Medicare statute, it follows that Congress intended the term to have the same meaning.

The Sixth Circuit reached this same conclusion in *Owensboro Health, Inc. v. United States Dep't of Health & Human Services,* 832 F.3d. 615 (6th Cir. 2016). In *Owensboro Health*, the Sixth Circuit, like the D.C. Circuit in *Adena*, construed the phrase "medical assistance under a State plan approved under [Medicaid]," as used in the Medicare statute. The Sixth Circuit concluded that the term "medical assistance," as used in the Medicare provision under review, had the same meaning as that identical term in a parallel provision of the Medicaid statute because, among other things, the Medicare provision "specifically refers to the subchapter [of the Medicaid statute] where the definition of medical assistance is found." *Owensboro Health*, 832 F.3d at 623; *see also Adena*, 527 F.3d at 180 (construing term "medical assistance under a State plan approved under [Medicaid]" in the Medicare statute to have same meaning as the identical term in parallel provision of the Medicaid statute because, among other things, the relevant provision of Medicare statute "expressly

refers to the Medicaid statute"). As *Owensboro* and *Adena* make clear, Congress' reference to Medicare in the Medicaid Payment Statute is persuasive evidence that Congress intended the term "primary specialty designation" in the Medicaid Payment Statute to have the same meaning as that term in the Medicare Payment Statute. And since that term in the Medicare Payment Statute clearly does *not* relate to whether a physician has reached any billing metric, the term as used in the Medicaid Payment Statute also does not relate to a physician's billing history.

**b**

The Defendants counter that the Medicare Payment Statute and the Medicaid Payment Statute should not be interpreted together because they were enacted separately. In support of that argument, Defendants primarily rely upon two cases in which courts refused to construe Medicare and Medicaid provisions together. However, those cases are distinguishable.

Defendants first cite *Abraham Lincoln Memorial Hospital v. Sebelius*, 698 F.3d 536 (7th Cir. 2012). In *Abraham Lincoln Memorial Hospital*, the plaintiffs contended that a "hold harmless" provision in a Medicaid statute should be interpreted to have the same meaning as a "reasonable cost" provision in a Medicare statute because the provisions had the same purpose. *Id.* at 554. The Seventh Circuit rejected that argument on the ground that the provisions of the Medicare and Medicaid statutes in question did *not* share the same language or use identical terms.

And the Seventh Circuit distinguished *Adena* on the basis that the D.C. Circuit ascribed the same meaning to identical terms in the Medicare and Medicaid statutes. *See id*. The decision in *Abraham Lincoln Memorial Hospital* thus says little, if anything, about whether *identical* terms in parallel provisions of the Medicaid and Medicare statutes – like "primary specialty designation" in the Medicaid Payment Statute and the Medicare Payment Statute – should be construed to have the same meaning.

Defendants next cite *Community Health Center v. Wilson-Coker*, 311 F.3d 132 (2d Cir. 2002), but their reliance on that decision is likewise misplaced. In *Community Health Center*, the Second Circuit declined to give the terms "reasonable" and "reasonable and related" in a provision of the Medicare statute the same meaning that those terms had under a provision of the Medicaid statute. *See id.* at 137. In support of that decision, the Second Circuit relied upon the rule that "identical words within [the] same statute need not have the same meaning 'when the identical word is used in [a] different provision which address *disparate* subjects'" *Id.* (emphasis added) (quoting in a parenthetical *Paragon Health Network, Inc. v. Thompson*, 251 F.3d 1141, 1147 (7th Cir. 2001)). *Community Health Center* does not help Defendants here because the Medicaid Payment Statute and Medicare Payment Statute do not "address disparate subjects." Rather, as explained above, they have the same purpose of promoting the availability of primary care services

for vulnerable populations. Moreover, the rule cited by the Second Circuit is a permissive one; it merely provides that a court is not required to construe identical terms identically when they appear in different statutory provisions. Here, for all of the reasons explained above, there are compelling reasons to construe "primary specialty designation" the same in the Medicaid Payment Statute and the Medicare Payment Statute. Thus, construing the two statutes together does not conflict with the rule applied in *Community Health Center*. Furthermore, the Second Circuit refused to construe the terms in the Medicare provision the same as in the Medicaid provision because doing so would have created a redundancy in the Medicare statute. *See id.* at 137. No similar concern exists here.

In sum, Defendants have failed to persuade the Court that the term "primary specialty designation" as used in the Medicaid Payment Statute should not be construed in light of – and, indeed, identical to – that same term as used in the Medicare Payment Statute.

**3**

Application of another canon of statutory construction also supports the conclusion that a physician's entitlement to enhanced payments under the Medicaid Payment Statute is not related to her billing history. This canon provides that "[o]mitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different

meanings." *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) (quoting *United States v. Ressam*, 553 U.S. 272, 276–77 (2008)).[11] Here, Congress included a billing threshold – *i.e.*, the 60% allowed-charges billing metric – in the Medicare Payment Statute, but Congress omitted such a threshold from the Medicaid Payment Statute. Congress' omission of a billing threshold or metric from the Medicaid Payment Statute under these circumstances is additional evidence that Congress did not intend to link a physician's entitlement to enhanced Medicaid payments to her billing history.

Defendants counter that the *Prewett* canon does not control here because (1) "although the [Medicaid Payment Statute and Medicare Payment Statute] were enacted closely in time, they are the product of two **separate** acts (the HCERA and the PPACA)" (Defs.' Memo in Support of Mot. for Summ. J., ECF #29-1 at Pg. ID 1250 (emphasis original)) and (2) Medicaid and Medicare are "two entirely distinct programs with fundamentally different rules governing eligibility for federal funds." (Defs.' Supp. Br., ECF #40 at Pg. ID 1410 (quoting *Abraham Lincoln Mem'l Hosp.*, 698 F.3d at 553).) But in *Owensboro Health*, the Sixth Circuit applied a very similar interpretive canon even though these two circumstances existed.

---

[11] The Court will hereinafter refer to this canon as the "*Prewett* canon." In the parties' briefs, they used the term "*Russello* canon" – formulated in *Russello v. United States*, 464 U.S. 16 (1983) – to express essentially the same concept.

As explained above, in *Owensboro Health*, the Sixth Circuit was called upon to interpret the meaning of "eligible for medical assistance under a State plan approved under [Medicaid]," as used in a Medicare provision. 832 F.3d at 620. As part of that court's analysis, it compared the language of the Medicare provision with language in a parallel provision of the Medicaid provision. And the court did so even though the provisions were enacted at different times in different public acts.[12] *Id.* at 622. The court explained that the omission from the Medicare provision of language that appeared in the Medicaid provision demonstrated that Congress intended the two provisions to have different meanings.[13] *Id.* Indeed, the court emphasized that interpreting the two provisions to have the same meaning despite

---

[12] The Medicare provision at issue in *Owensboro Health* was enacted as part the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. No. 99–272, § 9105 (1986) (amending 42 U.S.C. § 1395ww(d)(5) to add a "new" subparagraph containing the Medicare provision interpreted in *Owensboro Health*). The Medicaid provision at issue was enacted as part of the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 4703 (1990) (amending 42 U.S.C § 1396r–4 to add a "new" paragraph containing the Medicaid provision referenced in *Owensboro Health*).

[13] As noted above, the court in *Owensboro Health* was interpreting the phrase "eligible for medical assistance under a State plan approved under [Medicaid]" in a provision of the Medicare statute. 832 F.3d at 620. To construe that phrase, the Sixth Circuit looked to a parallel provision of the Medicaid statute that used the phrase "eligible for medical assistance under a State plan approved under [Medicaid] *or to low-income patients*." 42 U.S.C. § 1396r–4(c)(3)(B) (emphasis added). The Sixth Circuit concluded that, because the Medicare provision did not include the phrase "or [] low-income patients" that was present in the Medicaid provision, Congress did not intend to include "low-income patients" in the Medicare provision. *See Owensboro Health*, 832 F.3d at 622.

the omission of language from the Medicare provision would "render the distinction between the two [] provisions meaningless." *Id.* *Owensboro Health* thus confirms that the *Prewett* canon may properly be applied to the Medicaid Payment Statute and the Medicare Payment Statute even though they were enacted separately and appear in different statutes.

Defendants next contend that the *Prewett* canon does not apply here because the canon rests on "a hypothesis of careful draftsmanship" that is absent in this case. (Defs.' Memo in Support of Mot. for Summ. J., ECF #29-1 at Pg. ID 1260 (quoting *Port Auth. Trans-Hudson Corp. v. Sec'y, U.S. Dep't of Labor*, 776 F.3d 157, 164-65 (3d Cir. 2015)).) Defendants argue that the "process that produced both the PPACA and HCERA was [] extraordinarily complicated," and they direct the Court to the Supreme Court's observation in *King v. Burwell*, 135 S. Ct. 2480 (2015) that, as a result of that process, "'[t]he Affordable Care Act contains more than a few examples of inartful drafting.'" (*Id.* (quoting *King,* 135 S. Ct. at 2492.))

This argument is unpersuasive for at least two reasons. First, the process that produced the ACA, even if complicated, reinforces the interconnectedness of the PPACA and the HCERA. As the Court explained above, (1) the two acts were passed and signed into law within days of each other and (2) the HCERA was

specifically passed to *amend* the PPACA.[14]  The connection between the PPACA and the HCERA supports the application of the *Prewett* canon here.

Second, the Supreme Court in *King* did not suggest that the inartful drafting in the ACA somehow freed federal courts from applying ordinary rules of statutory construction – like the *Prewett* canon – to that Act.  On the contrary, in *King*, the Supreme Court attempted to apply an often-significant canon of statutory construction – the canon against construing statutory language as surplusage – and determined that the canon was not controlling because other tools of statutory construction "compel[led]" a conclusion at odds with the one suggested by the canon.  *King*, 135 S. Ct. at 2492-93.  In contrast here, the plain language of the Medicaid Payment Statute, its statutory context, and the canons of construction applicable to the provision all support the same conclusion: Congress did *not* intend that a physician's eligibility for enhanced payments under Medicaid be linked to her billing history.  Because other tools of statutory construction do not compel – nor even suggest – a conclusion at odds with application of the *Prewett* canon, the Court may properly apply the canon here.

---

[14] As noted above, the Medicaid Payment Statute mentions the part of the Medicare subchapter containing the Medicare Payment Statute.  That fact further reinforces that the two provisions are connected and that it is therefore appropriate to compare and contrast them as part of the effort to interpret their meanings.

Finally, the Defendants argue that the Court should not apply the *Prewett* canon because the Medicaid Payment Statute and the Medicare Payment Statute "are not parallel" and do not contain the same exact language. (Defs.' Memo in Support of Mot. for Summ. J., ECF #29-1 at Pg. ID 1259.) Defendants stress that the basis for applying the canon "'grows weaker with each difference in the formulation of the provisions under inspection,'" (*id.* (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002)), and they highlight that "[t]he Medicare statute applies to 'primary care practitioner[s]' while [in contrast] the Medicaid statute applies to a 'physician with a primary specialty designation of family medicine.'" (*Id.* (citations omitted).)

This difference, however, does not preclude the Court from applying the *Prewett* canon. The similarities between the two provisions – such as their use of the term "primary specialty designation" and their same purpose – counterbalance the difference in language identified by Defendants and support application of the canon. And in any event, while the difference in language may cause the interpretive force of the canon be "weaker" than it may be where the language of the two provisions is identical, *Ours Garage & Wrecker Serv., Inc.*, 536 U.S. at 435-36, the difference is not an absolute bar to application of the canon. So, while the *Prewett* canon may not "virtually command" the inference that Congress intended the Medicaid Payment Statute and the Medicare Payment Statute to have different

meanings, *Prewett*, 749 F.3d at 461, the canon nonetheless provides additional support for that conclusion.

**4**

In sum, all of the tools of statutory construction relevant here – analysis of the plain language of the Medicaid Payment Statute, a review of the Medicaid Payment Statute as it relates to the parallel Medicare Payment Statute, and application of the *Prewett* canon – considered collectively, yield the conclusion that Congress did not intend to link a physician's eligibility for enhanced Medicaid payments for primary care services to her billing history.

Defendants resist this conclusion. But in doing so, they do not point to any language in the Medicaid Payment Statute that suggests that Congress *did* intend to link eligibility for the enhanced payments to a physician's billing history.  Nor do Defendants explain how applying other rules of statutory construction could support that conclusion.  Instead, Defendants argue that the Medicaid Payment Statute "says absolutely nothing about" how to determine whether a physician has one of the three specified "primary specialty designations" that would qualify her for the enhanced payments. (Defs.' Memo in Support of Mot. for Summ. J., ECF #29-1 at Pg. ID 1254.)  Thus, Defendants assert, "CMS had to formulate some standard" for determining whether physicians were eligible for the increased payments. (*Id.* at Pg. ID 1255.)  And they insist that the 60% Billing Code Threshold was a reasonable

standard that appropriately accounted for CMS' need to audit attestations by physicians that they had a qualifying "primary specialty designation." (*See id.* at Pg. ID 1263-64.)

But Congress *did* say something about whether a physician's eligibility for enhanced Medicaid payments for primary care services should be linked to the physician's billing history. Indeed, as explained above, by using the term "primary specialty designation" and by omitting a billing metric from the Medicaid Payment Statute, Congress expressed its clear intent that the enhanced Medicaid payments would *not* be linked to a physician's billing history.

Simply put, the 60% Billing Code Threshold cannot be justified on the ground that Congress' failure to specifically define "primary specialty designation" left some room for CMS to interpret that phrase and to establish eligibility standards for enhanced payments under the Medicaid Payment Statute. While Congress did not specifically identify what CMS *could* consider when it determined whether a physician has a qualifying "primary specialty designation," Congress did make clear what CMS could *not* consider in making that determination – a physician's billing history.

Moreover, Defendants' contention that CMS had to "formulate some standard" for assessing whether a physician has a "primary specialty designation" is inconsistent with CMS' own practices. CMS did not formulate any standard for

"primary specialty designation" in the Final Medicare Payment Rule. CMS'
contention that it had to define this same term in the Final Medicaid Payment Rule
thus rings hollow. Likewise, Defendants' contention that CMS included the 60%
Billing Code Threshold in the definition of "primary specialty designation" because
it needed to establish a "uniform, auditable standard[] for identifying eligible
physicians," (Defs.' Memo in Support of Mot. for Summ. J., ECF #29-1 at Pg. ID
1245), is equally unpersuasive. CMS did not establish a mechanism to audit a
physician's self-attested "primary specialty designation" in the Final Medicare
Payment Rule.[15]

For all of the reasons explained above, the 60% Billing Code Threshold in the
Final Medicaid Payment Rule is contrary to Congress' intent, fails at step one of
*Chevron*, and is invalid.[16]

## IV

The final question before the Court is: what is the proper remedy that flows
from the Court's determination that the 60% Billing Code Threshold in the Final

---

[15] The Final Medicare Payment Rule establishes two criteria that a physician must
satisfy to qualify for enhanced payments. The physician must have a qualifying
"primary specialty designation" and must satisfy an allowed-charges billing metric.
(See the text of rule at Section I(B) above.) While CMS could audit a physician's
satisfaction of the rule's billing metric, the rule established no criteria for evaluating,
or means of auditing, a physician's claimed "primary specialty designation."

[16] Because the Court concludes that the 60% Billing Code Threshold in the Final
Medicaid Payment Rule fails at step one of the *Chevron* analysis, there is no need
for the Court to address Defendants' arguments with respect to step two of *Chevron*.

Medicaid Payment Rule is invalid?  Stated another way: should the Court void the entire rule, or may it affirm the provision of the rule tying "primary specialty designation" to a physician's board certification?  The Court determines that it must invalidate the rule in its entirety.

"Whether an administrative agency's order or regulation is severable, permitting a court to affirm it in part and reverse it in part, depends on the issuing agency's intent. Where there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper." *State of N.C. v. F.E.R.C.*, 730 F.2d 790, 795–96 (D.C. Cir. 1984); *see also Am. Petroleum Inst. v. Envtl. Prot. Agency*, 862 F.3d 50, 71 (D.C. Cir. 2017) (explaining that a court will "sever and affirm a portion of an administrative regulation only when [it] can say without any substantial doubt that the agency would have adopted the severed portion on its own" (quotations omitted)).

Here, the Court cannot "say without any substantial doubt" that CMS would have adopted a rule establishing board certification as the sole path to a "primary specialty designation."  In fact, during the notice and comment period, CMS said that it would *not* have adopted such a rule.  CMS explained that it "would *not* limit specified providers to physicians who are Board certified." (Admin. R., ECF #21-2 at Pg. ID 305; emphasis added.)   CMS' statement precludes severance and

affirmance of the portion of the rule establishing board certification as the sole path to a "primary specialty designation." *See Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 963-64 (D.C. Cir. 2013) (declining to sever and affirm portion of rule because "we know" that agency would not have adopted that portion standing alone), *overruled on other grounds by Am. Meat Inst. V. USDA*, 760 F.3d 18 (D.C. Cir. 2014).

Furthermore, under the "substantial doubt" standard, a court should sever and affirm only if the provisions at issue "operate[] entirely independently of one another." *Am. Petroleum Inst.*, 862 F.3d at 71 (quoting *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997)). If a court is "not sure" that the provisions are "wholly independent," then the non-challenged provision of the rule cannot be severed, and the court must invalidate the rule in its entirety. *Id.*

The Court is "not sure" that the 60% Billing Code Threshold and the board certification provision operate wholly independently of one another. Structurally, these provisions are presented as alternative paths to a "primary specialty designation," and eliminating one while retaining the other would substantially alter the scope of physicians qualifying for the enhanced payments. More importantly, throughout the rulemaking process, CMS considered both provisions together, and it never suggested that it could achieve Congress' intent of expanding primary care services by adopting board certification as the lone path to a qualifying "primary

specialty designation." (*See* Admin. R., ECF #21-2 at Pg. ID 301-21; Admin. R., ECF #21-10, at Pg. ID 1072-1106.) This is further evidence that the provisions are intertwined and, therefore, that the board certification provision of the rule is not severable. *See Am. Petroleum Inst.*, 862 F.3d at 72 (explaining that court was "not sure" that provisions of rule were "wholly independent" because, among other things, "at no point in the [administrative] record" did the agency propose adopting the rule without one of the provisions).

Defendants counter that in answering the remedy question, the Court should should "appl[y] a prejudicial error rule," under which "a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination." (Defs.' Supp. Br., ECF #40 at Pg. ID 1406-07; quotations omitted).) Defendants contend that the Court should leave intact the provision of the rule equating board certification with "primary specialty designation" because (1) CMS could have validly established board certification as the only path to a "primary specialty designation" and (2) Plaintiffs cannot show that they were prejudiced by CMS' decision to offer the 60% Billing Code Threshold as a second, alternative path to a "primary specialty designation." (*See id.*) But the "prejudicial error rule" that Defendants invoke does not govern the question of whether provisions of an administrative rule are severable. Indeed, neither of the "prejudicial error rule" cases that Defendants rely upon involve challenges to final

administrative rules.[17]   As explained above, in the context of a challenge to an administrative rule, the "substantial doubt" standard governs questions of severance.

Accordingly, because the Court has "substantial doubt" that CMS would have adopted the Final Medicaid Payment Rule with board certification as the sole path to a qualifying "primary specialty designation," the Court will not sever and affirm the board certification provision of the rule.  Instead, the Court will vacate the Final Medicaid Payment Rule in its entirety and remand to CMS for further proceedings.[18] *See Harmon v. Thornburgh,* 878 F.2d 484, 495 (D.C. Cir. 1989) ("When a court

---

[17] The "prejudicial error standard" cases cited by the Defendants did not involve challenges to administrative rules or regulations.  The Sixth Circuit's decision in *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435 (6th Cir. 2004) involved a challenge to an agency's decision to increase production of prisoner-made goods. *Id.* at 442-43.  And the Sixth Circuit's decision in *Sierra Club v. Slater*, 120 F.3d 623 (6th Cir. 1997) involved a challenge to an agency's issuance of an environmental permit. *Id.* at 637.

[18] In Plaintiffs' Amended Complaint, they do not specifically ask the Court to void the Final Medicaid Payment Rule in its entirety.  Instead, they ask the Court to "[d]eclare that the [Final Medicaid Payment Rule] is unlawful insofar as it requires the Physicians to meet the sixty-percent-threshold requirement as set forth in that rule in order to receiver increased payments under the [Medicaid Payment Statute]." (Am. Compl., ECF #19 at Pg. ID 210.)  However, Plaintiffs also ask the Court to "[a]ward such further additional relief as is just and proper." (*Id.* at Pg. ID 211.)  For the reasons explained above, because the board certification path to "primary specialty designation" is not severable from the 60% Billing Code Threshold, it is "just and proper" to invalidate the entire rule.  Moreover, Plaintiffs did ask the Court to invalidate the entire rule in their summary judgment motion. (Pls.' Memo in Support of Mot. for Summ. J., ECF #23 at Pg. ID 1151 ("[T]he Court should . . . hold that the [Final Medicaid Payment Rule's] sixty-percent-threshold requirement fails under *Chevron* and the APA, and hold that the [Final Medicaid Payment Rule] is invalid and unenforceable as a result.").

finds that an agency regulation is invalid in substantial part, and that the invalid portion cannot be severed from the rest of the rule, its typical response is to vacate the rule and remand to the agency." (footnotes omitted)); *see also Ass'n of Private Colleges & Universities v. Duncan*, 870 F. Supp. 2d 133, 154 (D.D.C. 2012) (vacating entire rule that was not severable and remanding to agency for further proceedings).

Finally, because the Court is invalidating the Final Medicaid Payment Rule *in toto*, the Court concludes TennCare is not entitled to recoup enhanced payments made to the Plaintiffs on the ground that Plaintiffs were ineligible for those payments under the rule.

## V

For the above reasons, **IT IS HEREBY ORDERED THAT**:

1. Plaintiffs' Motion for Summary Judgment (ECF #29) is **GRANTED**;

2. Defendants' Cross-Motion for Summary Judgment (ECF #22) is **DENIED**;

3. The Final Medicaid Payment Rule is **UNLAWFUL** and **SET ASIDE**;

4. This action is **REMANDED** to CMS for further proceedings consistent with this Opinion and Order; and

5.    TennCare may not recoup from Plaintiffs enhanced payments made to them pursuant to the Medicaid Payment Statute on the ground that Plaintiffs were not eligible to receive those payments under the Final Medicaid Payment Rule.


                                    s/Matthew F. Leitman
                                    MATTHEW F. LEITMAN
                                    UNITED STATES DISTRICT JUDGE
                                    SITTING BY SPECIAL DESIGNATION

Dated:  January 24, 2018